UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LATREESA CLAY,

      Plaintiff,

v.

MICHIGAN DEPARTMENT
OF CORRECTIONS,
JODI L. DEANGELO, SHERRI SANKEY,
SHARON RAMSEY, and JEREMY BUSH,

      Defendants.
_____/

Case No. 2:21-cv-11880
Honorable Linda V. Parker

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 44)

On July 21, 2021, Plaintiff Latreesa Clay, proceeding pro se,[1] filed this lawsuit claiming violation of her First Amendment rights under 42 U.S.C. § 1983. (ECF No. 1.) Ms. Clay later filed an Amended Complaint on August 30, 2021, (ECF No. 5) and a Second Amended Complaint on August 15, 2022 (ECF No. 18). Defendants are Jodi DeAngelo, Sherri Sankey, Sharon Ramsey, and Jeremy Bush (collectively "Defendants").[2]

---

[1] The Court granted Ms. Clay's counsel's motion to withdraw on June 7, 2023. (*See* ECF No. 41.)
[2] The Michigan Department of Corrections ("MDOC") was terminated as a defendant on November 3, 2021. (*See* ECF No. 10.)

1

This matter is presently before the Court on Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), which has been fully briefed. (ECF No. 44.) Finding the facts and legal arguments adequately presented in the parties' filings, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f). For the reasons that follow, the Court grants the motion.

**I.      Factual Background**

Ms. Clay was employed as a registered nurse at MDOC. (ECF No. 44 at Pg ID 281.) She had experience working at MDOC's Detroit Reentry Center ("DRC") and Detroit Detention Center ("DDC") facilities, and would sometimes be assigned to work at both facilities during the same shift. (*See* ECF No. 46 at Pg ID 478, 480; ECF No. 44-3 at Pg ID 356.) For example, on October 26, 2020, Ms. Ramsey, a nurse manager, sent an email notification to DRC and DDC staff informing them that, due to a shortage of nurses, Ms. Clay would be assigned to the DDC and provide emergency coverage at the DRC from October 26 through October 28, 2020. (ECF No. 44 at Pg ID 358.)

On this particular day, Ms. Clay took issue with the assignment change and made her concerns known to Ms. Ramsey and the other staff. (*Id.* at 356.) Ms. Clay sent two responses to Ms. Ramsey's email, telling them she refused to respond to any DRC emergencies because the assignment was outside of her job

responsibilities, and she could not provide adequate nursing care to the DDC critical dialysis patients and DRC emergency patients simultaneously. (*Id*. at 356-57.) She explained that it was her "duty and responsibility to inform [Ms. Sankey] and everyone else, [she is] refusing any assignment related to on call for emergencies at any facility to which [she is] not present, this is unsafe" and would constitute "reckless endangerment" and "inhumane practice." (*Id*.) Ms. Sankey, Ms. Clay's health unit manager, addressed Ms. Clay's concerns by email. (*Id*. at 353.) She reminded Ms. Clay of her responsibilities as an MDOC employee and made clear that she was expected to comply. (*Id*.)

Ms. Ramsey sent another notification to facility staff on October 30, 2020, communicating that Ms. Clay would again be responsible for DRC medical emergencies during her shifts on October 31, 2020, and November 1. (*Id*. at 358.) On the following day, during Ms. Clay's shift, a DRC prisoner underwent a medical emergency. (*Id*. at 343.) The DRC official on duty contacted Ms. Clay for medical assistance, to which she instructed him to call 911 because "she did not have the proper nurse coverage at the Detroit Detention Center (DDC) if she left." (*Id*.) The DRC official notified Ms. Sankey about Ms. Clay's refusal. (*Id*.) Ms. Sankey also ordered the official to call 911 and then contacted Ms. Clay, directing her to go to the DRC and warning her that refusal would result in a stop order and

3

termination. (*Id*. at 344, 359.) Ms. Clay still refused the assignment. (*Id*.) Ms. Sankey immediately reported the incident to another MDOC official. (*Id*. at 393.)

The next day, Ms. DeAngelo, an MDOC warden, informed Mr. Bush, a deputy director at MDOC, about the incident involving Ms. Clay. (*Id*.) Mr. Bush authorized a stop order against Ms. Clay. (*Id*. at 383.) At some point after the incident, Ms. Clay discussed what happened with friends and family, telling them that her supervisors ordered her to leave her designated work area in violation of state laws and health care practices. (ECF No. 44-4 at Pg ID 453.)

A deputy warden later requested MDOC's Internal Affairs Section to investigate the incident involving Ms. Clay. (ECF No. 44-3 at Pg ID 373.) Ms. DeAngelo approved the request. (*Id*. at 330.) As part of their investigation, the Internal Affairs Section collected questionnaires from several MDOC staff involved in the incident, including Ms. Clay, Ms. Ramsey, and Ms. Sankey. (*Id*. at 341-54.) The investigator found, and Ms. DeAngelo agreed, that Ms. Clay violated four MDOC policies. (*Id*. at 340, 347.)

A few weeks later, Ms. DeAngelo held a disciplinary conference with Ms. Clay to discuss the alleged violations and corresponding investigation. (*Id*. at 329-30.) After the meeting, Ms. Clay's disciplinary file was sent to Jennifer Nanasy, MDOC's Discipline Coordinator for final determination. (*Id*. at 330.) Ms. Nanasy ultimately decided to terminate Ms. Clay. (*Id*. at 470.)

## II. Standard of Review

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the

non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id*. at 255.

### III. Applicable Law and Analysis

Defendants contend that summary judgment is appropriate because (1) Ms. Clay does not have grounds to sue under § 1983, (2) she cannot establish a prima facie case for First Amendment retaliation, (3) the state's interests outweigh Ms. Clay's free speech interests, and (3) Defendants are protected from suit by the doctrine of qualified immunity. (*See generally* ECF Nos. 44, 47.) In viewing the record in the light most favorable to Ms. Clay, the nonmoving party, the Court finds a defect in her prima facie case, entitling Defendants to judgment as a matter of law.

#### A. First Amendment Retaliation Claim

The First Amendment, a safeguard for one of our nation's most essential rights, prevents the government from abridging individuals' freedom of speech. U.S. Const. amend. I. Accordingly, courts have consistently held that it is unlawful for an employer, and in certain instances, a public employer, to retaliate against employees for exercising their First Amendment rights. *E.g.*, *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563 (1968). Section 1983 guarantees First Amendment protection by allowing action against state and local

officials who have violated these rights. *E.g.*, *Shehee v. Luttrell*, 199 F.3d 295 (6th Cir. 1999).

To establish a viable First Amendment retaliation claim under § 1983, the plaintiff-employee must show that:

> (1) the plaintiff engaged in activities protected by the Constitution or statute; (2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) that this adverse action was taken at least in part because of the exercise of the protected conduct.

*Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).

The Court begins with the liability issue embedded in the second and third prongs.[3] The Sixth Circuit makes clear, particularly in First Amendment retaliation actions, that a plaintiff's claim will be defeated if the defendant did not fire the plaintiff or lacked authority to do so. *See Shehee v. Luttrell*, 199 F.3d 295, 300-01 (6th Cir. 1999) (no liability when the prison employees did not have any authority in the decision to fire the plaintiff from his commissary job); *Poppy v. City of Willoughby Hills*, 96 F. App'x 292, 294-95 (6th Cir. 2004) (no liability where the mayor was not the decisionmaker as to the terms and conditions of

---

[3] The Court addresses these elements hand in hand with Defendants' argument that the named parties did not have personal involvement in the decision to terminate Ms. Clay, which, according to Defendants, makes Ms. Clay's claim baseless. (ECF No. 44 at Pg ID 288-89.)

plaintiff's employment); *Fritz v. Charter Twp. of Comstock*, 463 F. App'x 493, 500 (6th Cir. 2012) (no liability where the defendant, a township supervisor, was not part of the administrative body that caused the adverse action); *Cohen v. Smith*, 58 F. App'x 139, 142-44 (6th Cir. 2003) (no liability because the defendants did not have the power to fire the plaintiff, even though they instigated the investigation that led to the plaintiff's removal from his residency program); *Smith*, 250 F.3d at 1035, 1038 (no liability where the incarcerated plaintiff's counselor was not the decisionmaker, and her only involvement in the adverse action included vague comments and carrying out the administrative procedures related to the plaintiff's transfer). This rule considers the basic idea that a sufficient causal connection does not exist between the plaintiff's protected speech and the alleged adverse action when the defendant is not the decisionmaker in the case. *See id*. at 1038 ("Winkler's comments do not demonstrate a causal connection between [plaintiff's] filing of grievances and the decision to transfer him because it is uncontroverted that she was not the decisionmaker in this case. Consequently, her statements cannot be taken as evidence of a retaliatory motive." (citations omitted)).

Against this backdrop, the issue narrows down to whether there is enough evidence to allow a reasonable jury to conclude that Defendants had the power to terminate Ms. Clay. The Court is unpersuaded to find that such evidence exists in

8

the record. The facts here fall squarely within the line of cases that have denied holding a defendant liable for First Amendment retaliation under § 1983. In her declaration, Ms. Nanasy declared that she made the decision to terminate Ms. Clay. (ECF No. 44-5 at Pg ID 470.) She further stated that her decision came after "independent review of [Ms. Clay's] discipline packet" and the Defendants "had no authority to discharge Ms. Clay." (*Id*.) A close review of the record supports Ms. Nanasy's written statement.

*Defendant Ramsey*. Ms. Ramsey, a nurse manager at the time of the incident, emailed MDOC staff alerting them that the DRC was short a registered nurse and Ms. Clay would provide coverage for any DRC emergencies during her shifts on October 26, 2020, through October 28, October 31, and November 1. (ECF No. 44-3 at Pg ID 358, 395.) Ms. Clay responded to one of Ms. Ramsey's emails, stating that she refused to provide DRC coverage because it was an assignment different than what she was hired to do, and the assignment violated MDOC policies and nursing practices. (*Id*. at 356.)

Ms. Ramsey later completed an investigative questionnaire as part of MDOC's internal investigation of Ms. Clay and the allegations against her. (*Id*. at 348-50.) Ms. Ramsey indicated in the questionnaire that after Ms. Clay responded to her email, she and Ms. Sankey discussed that Ms. Sankey would address Ms. Clay's concerns. (*Id*. at 349-50.) She also wrote on her questionnaire that it was

9

common for nurses to cover both DRC and DDC facilities and, on the day of the incident, Ms. Clay was not responsible for more than sixty critical dialysis patients. (*Id.*)

*Defendant Sankey.* In response to Ms. Clay's email refusing to be on call at the DRC, Ms. Sankey, Ms. Clay's health unit manager, emailed Ms. Clay, informing her that she would be subject to disciplinary action if she did not provide emergency coverage at the DRC. (*Id.* at 355-57.)

On October 31, 2020, a DRC official notified Ms. Sankey that Ms. Clay refused to respond to an emergency at the DRC involving a prisoner who was having trouble breathing. (*Id.* at 359.) According to Ms. Sankey, she instructed the official on duty to call 911 and then called Ms. Clay at the DDC. (*Id.*) Ms. Sankey directed and cleared Ms. Clay to respond to the DRC emergency, to which Ms. Clay declined and said that there was not a registered nurse to cover the DDC facility. (*Id.*) Ms. Ramsey reiterated to Ms. Clay that refusal to respond to the emergency would result in disciplinary action, including a stop order and the possibility of termination. (*Id.*) Following her phone conversation with Ms. Clay, Ms. Sankey contacted another MDOC official to inform them about the incident. (*Id.* at 393.)

Ms. Sankey also took part in the investigation involving Ms. Clay. (*Id.* 351-54.) She recounted the events surrounding the incident in an investigative

10

questionnaire. (*Id.*) She also indicated in the questionnaire that DRC and DDC are treated as one facility and that it was common practice for nurses to cover more than one site. (*Id.*)

*Defendant DeAngelo.* According to the record, Ms. DeAngelo, an MDOC warden, informed Mr. Bush (a deputy director at MDOC) about the incident involving Ms. Clay the day after it occurred. (*Id.* at 383.) Ms. DeAngelo also approved the request to initiate the investigation and alleged violations against Ms. Clay. (*Id.* at 330.) After the Internal Affairs Section completed their investigation, they compiled their findings into an official memorandum and sent it to Ms. DeAngelo. (*Id.* at 338.) Ms. DeAngelo reviewed the completed investigation report and "agree[d] with the investigator's findings of Sufficient Evidence for [violations of] Work Rules #5, #9, #12, and #27." (*Id.* at 340.)

A few weeks later, Ms. DeAngelo held a disciplinary conference with Ms. Clay, an investigator from the Internal Affairs Section, and a union representative. (*Id.* at 329.) During the meeting, Ms. DeAngelo discussed with Ms. Clay the alleged violations and corresponding investigation and findings. (*Id.* at 329-30.) The record indicates that the conference ended with Ms. DeAngelo upholding the work rule violations and confirming that the disciplinary file would be sent to the MDOC's Discipline Coordinator for final determination. (*Id.* at 330.)

*Defendant Bush.* A few hours after Ms. DeAngelo informed Mr. Bush about Ms. Clay's refusal to provide care for the prisoner at the DRC, Mr. Bush authorized a stop order against Ms. Clay. (*Id*. at 383.)

"Because it is uncontroverted that [Defendants were] not the decisionmaker[s] in this case," Defendants' involvement in the incident and corresponding investigation do not establish the necessary causal connection between (1) Ms. Clay's refusal to attend to the DRC emergency or (2) her conversations with her friends and family (the alleged protected speech) and Ms. Nanasy's decision to terminate her.[4] *See Smith*, 250 F.3d at 1038.

"Usually, the question of causation is a factual issue to be resolved by a jury, and may be satisfied by circumstantial evidence." *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996) (internal citation omitted). But Ms. Clay has not set forth (and

---

[4] Even in viewing the record in the light most favorable to Ms. Clay, the Court does not find that the facts, as presented, align with the handful of cases imputing liability onto non-decisionmakers. *See, e.g.*, *Sykes v. Anderson*, 625 F.3d 294, 311-17 (6th Cir. 2010) (holding that the defendant police officers were not absolved of liability under a § 1983 Fourth Amendment malicious prosecution claim when they made false claims that led to the criminal proceedings against the plaintiffs); *Harris v. Bornhorst*, 513 F.3d 503, 519-20 (6th Cir. 2008) (holding that even though the defendant-prosecutor lacked authority to bar the plaintiff from the U.S. Marines, her remarks to the recruiters about the plaintiff's civil suit against her was evidence that her comments "were motivated by retaliatory animus," rather than a desire to provide accurate information to the recruiters). Here, there is no genuine issue of material fact that calls into question the accuracy of Defendants' responses to the investigation and appropriate MDOC officials or whether they desired to do anything other than submit factual information.

the record does not evidence) specific facts that would allow a reasonable jury to infer–let alone conclude–that Defendants made the decision to terminate her or had the authority to terminate her.

The Court's failure to find a genuine issue of material fact as to the causal connection between the adverse action underlying Ms. Clay's claim and Defendants' conduct prompts the Court to leave open the constitutional question of whether Ms. Clay engaged in speech that is protected under the First Amendment.[5] *See Cohen*, 58 F. App'x at 143 ("Because we hold that the adverse action of which [the plaintiff] complains does not bear that necessary causal connection to the conduct at issue, we are able to avoid reaching the constitutional question of whether [the plaintiff's] conduct was protected under the First Amendment."); *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 478 (1995) (emphasizing "[o]ur policy of avoiding unnecessary adjudication of constitutional issues"); *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other

---

[5] The Court also leaves open the issues Ms. Clay raises in her response to Defendants' motion for summary judgment: her work assignment changes and the terms of her union contract, as they do not have any bearing on her First Amendment retaliation claim. (*See* ECF No. 46 at Pg ID 474, 476-77.)

13

ground upon which the case may be disposed of."). Therefore, the Court need not address the first prong of Ms. Clay's claim.

Furthermore, the Court need not partake in the balancing test used to weigh the state's efficiency interests against Ms. Clay's interests in speaking out or the issue of qualified immunity because Ms. Clay has not met her burden with respect to her prima facie case.

### IV. Conclusion

For these reasons, Ms. Clay cannot sustain her claim against Defendants and Defendants are entitled to summary judgment with respect to Plaintiff's First Amendment retaliation claim under § 1983.

Accordingly,

**IT IS ORDERED** that the motion for summary judgment (ECF No. 44) filed by Defendants Jodi DeAngelo, Sherri Sankey, Sharon Ramsey, and Jeremy Bush is **GRANTED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: September 30, 2024

I hereby certify that a copy of the foregoing document was mailed to counsel of record and/or pro se parties on this date, September 30, 2024, by electronic and/or U.S. First Class mail.

                <u>s/Aaron Flanigan</u>
                Case Manager